```
┌─────────────────────────────┐
│ USDS SDNY                   │
│ DOCUMENT                    │
│ ELECTRONICALLY FILED        │
│ DOC #:                      │
│ DATE FILED: 4-23-14         │
└─────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
HIRAM YEARWOOD,

                              Plaintiff,                    12 Civ. 6985 (PKC)

          -against-                                         MEMORANDUM
                                                            AND ORDER

THE NEW YORK AND PRESBYTERIAN
HOSPITAL and 1199 SEIU UNITED
HEALTHCARE WORKERS EAST,

                              Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

          Plaintiff Hiram Yearwood brings suit against his former employer, defendant

New York Presbyterian Hospital (the "Hospital"), and his union, defendant 1199 Service

Employees International 1199-SEIU (the "Union").[1]  Yearwood alleges that the Hospital

breached its collective bargaining agreement (the "CBA") with the Union by terminating him

without cause, in violation of the Labor Management Relations Act ("LMRA").  29 U.S.C. § 185

et seq.  Yearwood further alleges that, by failing to adequately grieve his termination and refer

the matter to arbitration, the union breached its duty of fair representation under the National

Labor Relations Act ("NLRA").  29 U.S.C. § 151 et seq.

          Asserting that Yearwood's termination is subject to an arbitration provision set

forth in the CBA, the Union has moved against the Hospital to compel arbitration.  The Hospital

opposes the Union's motion and has cross-moved for summary judgment pursuant to Rule 56,

Fed. R. Civ. P., on the grounds that the Union has not breached its duty of fair representation and

---

[1] The defendants move to amend the caption to identify them as "The New York and Presbyterian Hospital" and
"1199SEIU United Healthcare Workers East."  The motion (Docket # 44) is granted and the Clerk is directed to
amend the caption.

that Yearwood's termination was for cause.  In its reply, the Union has joined the Hospital's

motion to the extent that it is premised upon the conclusion that the Union did not breach its duty

of fair representation.  In response to the Union's submissions, the Hospital has moved to strike a

portion of the Union's reply as improperly asserting new facts not previously before the Court.

        The Court concludes that, based on the submissions of the parties, the Union's

attempt to compel arbitration is untimely.  Consequently, the Court concludes that the Union

breached its duty of fair representation.  The Court further concludes that there are material

issues of fact in dispute as to whether Yearwood was terminated for cause.

        For reasons further explained, the Union's motion to compel arbitration (Docket

# 44) is denied.  The Hospital's motions for summary judgment and to strike the Union's reply

(Docket # 57**,** 73) are denied.  After due notice to the parties, the Court grants summary

judgment in favor of non-movant Yearwood against the Union, declaring that the Union

breached its duty of fair representation.

## BACKGROUND

        The Hospital is a not-for-profit corporation that provides inpatient, ambulatory,

and preventative medical care.  (Minsky Aff. ¶ 2.)  It is a signatory to a CBA with the Union that

represents a number of Hospital employees.  (See id. ¶ 6.)

        On April 12, 2004, plaintiff Yearwood was hired into the Hospital's

Housekeeping Department and became a Union member.  (Id. ¶ 10; Stanberry Affirm. Ex. A, at

199).  On May 28, 2007, Yearwood transferred to the Atchley Pavilion mailroom where he

worked as a mailroom "Receptionist."  (Minsky Aff. ¶ 11.)  In this role, Yearwood's

responsibilities included "[s]hipping and receiving interoffice and outside mail and packages."

(Stanberry Affirm. Ex. A Ex. E, at 1.)

According to the Hospital's "Policy and Procedure Manual," no personal mail was to be processed by the mailroom.  (Minksy Aff. Ex. D, at 1; Minsky Aff. Ex. E, at 2.)  When Yearwood began working in the mailroom, he did not receive any formal training and was never shown a copy of the "Policy and Procedure Manual."  (Stanberry Affirm. Ex. A Ex. F, at 102–03.)  The only training he received was "on the job" by his supervisors who showed him mailroom procedures then in use.  (Stanberry Affirm. Ex. A, at 188–89.)

Despite the Hospital's written policy, it was common for employees to have personal packages sent to the Hospital.  (Stanberry Affirm. Ex. A Ex. F, at 114.)  According to the unofficial mailroom procedure, when an employee expected a personal package, either addressed to him or another, he would call the mailroom and request that the package be held.  (Id. at 114, 117.)  No single mailroom employee was tasked with answering the telephone.  (See Stanberry Affirm. Ex. A, at 54–55.)  Once the package arrived, a mailroom worker would return the employee's call.  (Id. at 59–60.)  The employee would then go to the mailroom to pick up his package and sign for it.  (Id.)  In order to access the mailroom, the employee had to go to the basement of a Hospital building and past a security guard.  (Stanberry Affirm. Ex. A Ex. F, at 113.)

On the morning of Friday, November 20, 2009, Yearwood received a call in the mailroom from Coby Cassells who stated that he was expecting a package addressed to Paul Rosen.  (Stanberry Affirm. Ex. A, at 45–47.)  Cassells was a former mailroom employee and a frequent visitor.  (Stanberry Affirm. Ex. A Ex. F, at 108–10.)  Since his departure from the mailroom, Cassells had picked up packages addressed to Paul Rosen on multiple occasions.  (Id. at 113.)  Whenever Cassells entered the mailroom, his Hospital ID badge was visible and Yearwood believed that Cassells was an employee in another Hospital department.  (Stanberry

Affirm. Ex. A, at 52, 83.)  Yearwood also believed that Paul Rosen was a doctor in the Hospital.

(Stanberry Affirm. Ex. A Ex. F, at 104, 110–11.)  In reality, Cassells had not been an employee

since 2008, and Rosen did not exist.  (Id. at 85–86.)

Around 3:00 p.m., a package was delivered to the mailroom addressed to Paul

Rosen.  (Stanberry Affirm. Ex. A, at 47.)  Yearwood accepted the package.  (Id.)  He then logged

the receipt of the package and placed it in the mailroom.  (Id.)  When Yearwood logged the

package, Paul Rosen's name appeared in the mailroom's computer database, having been added

by a coworker.  (Id. at 54; Stanberry Affirm. Ex. A Ex. F, at 107.)  Yearwood then called

Cassells to inform him of the package's arrival.  (Stanberry Affirm. Ex. A, at 61.)  Cassells told

Yearwood that he would pick up the package on the following Monday.  (Id. at 62.)

Later that afternoon, Yearwood was approached by two undercover police

officers looking for a package containing "connectors."  (Id. at 68–69.)  The officers had been

tracking Cassells's package, which contained forty-two pounds of marijuana, as part of a sting

operation.  (Minsky Aff. ¶ 13; Stanberry Affirm. Ex. A Ex. F, at 77–78, 84.)  Believing the

officers to be electricians working on construction in the Hospital, Yearwood asked for a

package tracking number.  (Stanberry Affirm. Ex. A, at 69; Stanberry Affirm. Ex. A Ex. F, at

105.)  When they were unable to provide one, he offered to take them to the "big mailroom" to

look for the package.  (Stanberry Affirm. Ex. A, at 69.)  After Yearwood brought the officers to

the mailroom, he was arrested and placed in a police car.  (Id. at 70.)

The officers informed Yearwood that he was under arrest and advised him to

remain silent.  (Id.)  Yearwood repeatedly asked why he was being arrested, but was not given

any more information.  (Id.)  After about twenty to thirty minutes, the police placed Cassells,

who had also been arrested, into the car with Yearwood.  (Id. at 71.)  Yearwood and Cassells

were then taken to the police station.  (Id. at 72.)

        At the station, police officers questioned Yearwood for at least five hours.  (Id.)

The officers explained that because Yearwood had accepted Cassells's package and called him,

they believed Yearwood to be involved with Cassells's activities.  (See id. at 72–73.)  Yearwood

explained that he was simply following procedure, was not friends with Cassells, and only knew

Cassells as a Hospital employee.  (Id. at 73–75.)  Throughout the questioning, Yearwood was

unaware of the contents of the package.  (Stanberry Affirm. Ex. A Ex. F, at 110, 119.)  Once the

police concluded their questioning, Yearwood was told that he could leave and that the police

believed he "had nothing to do with it."  (Id. at 112.)  Yearwood was never charged with any

wrongdoing.  (Id.)

        The following Monday, November 23, Yearwood provided a full incident report

to the Hospital and the Union.  (Stanberry Affirm. Ex. A, at 76–77.)  In the report, Yearwood

described his arrest and subsequent release.  (Stanberry Affirm. Ex. A. Ex. F, at 1–2.)  Yearwood

noted that he was hopeful that the Hospital would thoroughly investigate the matter and "totally

clear[]" his name.  (Id.)  Yearwood then met with Shawn McCollister, a member of the

Hospital's human resources department, and two Union representatives.  (Stanberry Affirm. Ex.

A, at 78.)  At that meeting, Yearwood stressed that he was an innocent bystander and had

nothing to do with Cassells's actions.  (See id.)  After the meeting, McCollister suspended

Yearwood pending further investigation.  (Id. at 79.)

        On November 25, the Hospital provided Ronald Fletcher, a Union negotiator,

with notice of Yearwood's suspension.  (Id. at 14; Minsky Aff. Ex. F, at 1.)  Five days later,

Fletcher sent a letter to Yearwood informing him of his right to grieve the suspension.

(Stanberry Affirm. Ex. A. Ex. F, at 4.)  In response, Yearwood asked Fletcher for help.

(Stanberry Affirm Ex. A, at 84.)  Fletcher then sent McCollister a letter grieving Yearwood's

suspension.  (Minsky Aff. Ex. G, at 1.)

Subsequently, the Hospital investigated the incident.  (Stanberry Affirm. Ex. A

Ex. F, at 91.)  During the course of the investigation, the Hospital learned that at least one other

mailroom employee had accepted a package for a non-employee.  (Id. at 121.)  As a result, the

employee was given a written reprimand.  (Id. at 113; Stanberry Affirm. Ex. A, at 158.)

According to McCollister, the employee was "disciplined appropriately."  (Stanberry Affirm. Ex.

A Ex. F, at 121.)

On January 21, 2010, Yearwood was called to a meeting with McCollister and

David Rodriguez, a Union representative.  (Stanberry Affirm. Ex. A, at 89.)  At that meeting,

McCollister provided Yearwood with a notice of termination and fired him.  (Id.)  The notice

stated that Yearwood was being terminated due to "[g]ross misconduct, creating unsafe

conditions and facilitation of illegal activity on Hospital Premises."  (Stanberry Affirm. Ex. A.

Ex. F, at 6.)  The notice further stated that Yearwood, on more than one occasion, accepted

packages that he knew were addressed to fictitious persons.  (Id.)  Disagreeing with

McCollister's characterization of events, Yearwood refused to sign the notice.  (Stanberry

Affirm. Ex. A, at 90.)  McCollister then handed the notice to Yearwood and said "Well, you

know you are being terminated."  (Id.)

The next day, the Hospital notified the Union of Yearwood's termination.

(Minsky Aff. Ex. H, at 1.)  In accordance with the terms of the CBA, the Hospital and the Union

scheduled a grievance hearing for March 11, 2010, regarding the termination.  (Minsky Aff.

¶¶ 14, 18.)  Prior to the hearing, Yearwood met with Union officials multiple times to discuss his

case.  (Stanberry Affirm. Ex. A, at 138–42.)  At the hearing, Fletcher and Rodriguez,

representing Yearwood, sought his reinstatement with the Hospital.  (Id. at 98, 100.)

On March 29, the Hospital informed the Union that its grievance was denied and

Yearwood's termination would stand.  (Minsky Aff. Ex. J, at 1.)  Under the terms of the CBA,

when a grievance is denied, the Union may refer the matter to arbitration within thirty "working

days" of the denial.  (Minsky Aff. Ex. A, at 94.)  On April 5, the Union informed Yearwood that,

after conducting a "thorough investigation," it would not be referring his case to arbitration.

(Stanberry Affirm. Ex. A Ex. F, at 18.)  The letter further stated that Yearwood could appeal the

Union's decision within seventy-two hours of his receipt of the letter.  (Id.)  The next day,

Yearwood informed the Union that he wished to appeal the Union's decision not to arbitrate.

(Id. at 17.)  After learning that other employees were only given written reprimands for engaging

in behavior for which Yearwood was terminated, the Union changed its opinion, believing that

Yearwood had a meritorious grievance and that the Union may prevail in arbitration.  (See Supp.

Fletcher Aff. ¶ 6.)

Though the Union was obligated to refer the matter to arbitration by April 30,

thirty days after the grievance had been denied, the Hospital agreed to extend the deadline until

December 21.  (Stanberry Affirm. Ex. A Ex. F, at 91; Supp. Fletcher Aff. Ex. B, at 1.)  On

December 10, the Union acquiesced in Yearwood's request, referred the case to arbitration with

the American Arbitration Association (the "AAA"), and provided Yearwood with a copy of the

request.  (Fletcher Aff. Ex. C; Stanberry Affirm. Ex. A, at 166.)

On December 15, the AAA sent a letter to the Hospital and the Union

acknowledging referral of the case and providing instructions for the selection of an arbitrator.

(Tekyi Decl. Ex. A, at 1.)  Using the AAA's process, an arbitrator could not be selected without

the cooperation of both parties.  (See id.)  According to the letter, the parties were to select an arbitrator within seven days of receiving the AAA's letter.  (Id.)  Nine months later, on September 16, 2011, the parties informed the AAA that they had selected George Nicolau to be the arbitrator for the case.  (Rodriques Aff. Ex. A, at 1.)  The AAA appointed Nicolau as arbitrator on October 3.  (Rodriques Aff. Ex. B, at 1.)

For the next six months, the AAA unsuccessfully attempted to schedule a date for the arbitration hearing that would be agreeable to both the Hospital and the Union.  (See Rodriques Aff. ¶¶ 5–7.)  During the pendency of the arbitration, the AAA informed the Union that the Hospital requested that the matter be placed in abeyance pending a settlement.  (Rodriques Aff. Ex. C, at 1.)  The Union responded that it was unaware of any settlement and requested a conference with both the arbitrator and the Hospital in order to secure an arbitration date.  (Rodriques Aff. ¶ 7.)

On June 5, with no arbitration date set, the AAA informed the Hospital and the Union that Nicolau had resigned as arbitrator.  (See Smith Aff. Ex. A, at 1.)  The AAA provided the parties with a list of potential arbitrators and instructed them to select an arbitrator within seven days of receiving the letter.  (Id.)

While the AAA was attempting to set a date for arbitration, Yearwood frequently requested updates from the Union.  (See id. at 197–99.)  Between March, 2011 and May, 2012, Yearwood had a number of conversations with Union representatives and sent a number of letters and e-mails to various Union officials.  (Id.; Stanberry Affirm. Ex. A. Ex. F, at 61–67, 138, 140–44.)  The Union told Yearwood "many times" that it was attempting to arbitrate his case, but that the Hospital was "refusing to go to arbitration."  (Stanberry Affirm. Ex. A, at 113–14.)

Based on the Union's responses, Yearwood assumed that it was not doing anything on his behalf.  (Id. at 135.)  Consequently, on January 19, 2012, Yearwood brought suit against the Hospital and Cassells in the Supreme Court of the State of New York, County of New York.  (Stanberry Affirm. Ex. B, at 1.)  On August 29, Yearwood amended the complaint to remove Cassells as a defendant and add the Union as a new party.  (Stanberry Affirm. Ex. A, at 1.)  Yearwood served the Union two days later.  (Notice of Removal 1, Docket # 1.)  In the amended complaint, asserting only claims arising under federal law, Yearwood alleged that the Union breached its duty of fair representation and that the Hospital breached the CBA when it terminated him without cause.  (Stanberry Affirm. Ex. A ¶¶ 18, 23.)

On September 10, 2012, the Union sent a letter to the AAA stating that the Hospital was "not interested in pursuing the matter further" and requested that the AAA proceed with administration of the case.  (Smith Aff. Ex. B, at 1.)  Two days later, the Hospital sent the AAA a letter stating that the matter had been withdrawn from arbitration and "the case file should remain closed pending a final ruling" in Yearwood's state court case.  (Smith Aff. Ex. C, at 1.)

Four days after contacting the AAA, the Union properly removed Yearwood's state court action to this Court.  (Notice of Removal 2–3; see also 28 U.S.C. §§ 1331, 1441. The Union subsequently moved to dismiss the action, or, in the alternative, stay the action pending the completion of its arbitration with the Hospital.  Yearwood v. N.Y. Presbyterian Hosp., No. 12 Civ. 6985(PKC), 2013 WL 4713793, at *1 (S.D.N.Y. Aug. 20, 2013).  In an Order dated July 22, 2013, the Court requested that the Union and the Hospital inform it of the status of the arbitration.  (Order 4, Docket # 27.)

On August 5, 2013, the Union informed the Court that it was attempting to arbitrate, but, due to the Hospital requesting that the case file remain closed during the pendency of Yearwood's action, and its refusal to select an arbitrator, had been unable to proceed.  The Union further noted that its September 10, 2012, letter was its "most recent" communication with the AAA.  On the same day, the Hospital informed the Court that, in its view, there was no pending arbitration.

In a Memorandum and Order dated August 20, the Court denied the Union's motion to dismiss and set a deadline for fact discovery of December 6, 2013, later extended to December 16, 2013.  Yearwood, 2013 WL 4713793, at *6; (Order 1, Docket # 35.)  On September 11, 2013, the Union filed its Answer and brought a cross-claim against the Hospital to compel arbitration.  (Answer & Cross-cls. 7, Docket # 30.)

Four days before the close of discovery, the Union sought leave to move the Court to compel arbitration and filed its motion on December 20.  (Letter, Docket # 38; Docket # 44.)  The Hospital subsequently cross-moved for summary judgment, asserting both that Yearwood's termination was for cause, and the Union did not breach its duty of fair representation.  (Docket # 57.)  The Union joined the Hospital's motion to the extent that the premise of the motion was that the Union did not breach its duty of fair representation.  (Docket # 64.)

On April 3, 2014, the Court provided notice under Rule 56(f)(1), Fed. R. Civ. P., that it may sua sponte grant summary judgment in favor of Yearwood on his claim that the Union breached its duty of fair representation and provided the parties with an opportunity to respond.  (Order 1, Docket # 80.)

LEGAL STANDARDS

I.   Motion to Compel Arbitration

The Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1 et seq., "is an expression
of 'a strong federal policy favoring arbitration as an alternative means of dispute resolution.'"
Ragone v. Atl. Video at Manhattan Ctr., 595 F.3d 115, 121 (2d Cir. 2010) (quoting Hartford
Accident & Indem. Co. v. Swiss Reinsurance Am. Corp., 246 F.3d 219, 226 (2d Cir. 2001)).

Section 2 of the FAA provides for the enforceability of written agreements to
arbitrate. 9 U.S.C. § 2. The FAA also establishes procedures by which federal courts may
implement section 2's substantive rule. Section 3 of the FAA provides that "upon being satisfied
that the issue involved in [a] suit or proceeding [pending before it] is referable to arbitration
under" an arbitration agreement, the district court "shall on application of one of the parties stay
the trial of the action until such arbitration has been had in accordance with the terms of the
agreement, providing the applicant for the stay is not in default in proceeding with such
arbitration." 9 U.S.C. § 3.

A district court must resolve four inquiries to determine whether all or part of an
action is arbitrable:

> [F]irst, it must determine whether the parties agreed to
> arbitrate; second, it must determine the scope of that
> agreement; third, if federal statutory claims are asserted, it
> must consider whether Congress intended those claims to
> be nonarbitrable; and fourth, if the court concludes that
> some, but not all, of the claims in the case are arbitrable, it
> must then decide whether to stay the balance of the
> proceedings pending arbitration.

JLM Indus. Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 169 (2d Cir. 2004) (quoting Oldroyd v.
Elmira Sav. Bank, FSB, 134 F.3d 72, 75-76 (2d Cir. 1998) (alteration in original)).

When called upon to decide a motion to compel arbitration, or to prevent arbitration, courts use a summary judgment standard.  Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003).  Under this standard, if there is a material issue of fact in dispute as to "the making of the agreement for arbitration or the failure to comply therewith," a court must deny the motion and hold a trial on the issue.  See 9 U.S.C. § 4; Bensadoun, 316 F.3d at 175.  Disputes surrounding other issues, such as affirmative defenses traditionally decided without a jury, may be resolved by a court as a motion, and without a full hearing.  See 9 U.S.C. § 6; World Brilliance Corp. v. Bethlehem Steel Co., 342 F.2d 362, 365–66 (2d Cir. 1965) (stating that the policy of the FAA "would hardly be advanced by affording a jury trial on the issue of laches, an issue traditionally decided by a judge, sitting in equity without a jury").

II.  Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed. R. Civ. P.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).  A dispute about a fact is material if it "might affect the outcome of the suit under the governing law."  Id. at 248.  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

"[T]he burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists."  Gallo v. Prudential Residential Services, Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  In response, the non-movant bears only a "limited burden of production," Powell v. Nat'l Bd. of Medical Examiners, 364 F.3d 79, 84 (2d Cir. 2004), and "all ambiguities must be resolved and all inferences drawn in favor of the party against whom

summary judgment is sought," <u>Gallo</u>, 22 F.3d at 1223.   Nevertheless, the non-movant "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." <u>Liberty Lobby, Inc.</u>, 477 U.S. at 248 (quoting <u>First Nat'l Bank of Ariz. v. Cities Svcs. Co.</u>, 391 U.S. 253, 288 (1968)).   Those specific facts must be supported by "citing to particular parts of materials in the record," Rule 56(c)(1)(A), Fed. R. Civ. P, and any affidavits relied upon "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Rule 56(c)(4), Fed. R. Civ. P.   "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Liberty Lobby, Inc.</u>, 477 U.S. at 249–50 (citations omitted).

Local Civil Rule 56.1 of this District requires a summary judgment movant to submit a statement with numbered paragraphs setting forth "the material facts as to which the moving party contends there is no genuine issue to be tried."  Local Civil Rule 56.1(a).  "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."  Local Civil Rule 56.1(c).  "Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."  Local Civil Rule 56.1(d).

DISCUSSION

I.   <u>The Union's Motion to Compel Arbitration Is Denied.</u>

The Union and the Hospital do not dispute that they are both signatories to the CBA and that its arbitration clause covers controversies involving employee termination. Yearwood does not object to arbitration by the Union of his claims.  The Hospital argues that the

Union's motion to compel arbitration was not timely and that the controversy is not arbitrable under the terms of the CBA.

In this Circuit, a request to compel arbitration must be made within six months of a "clear[] and unequivocal[]" refusal by a party to arbitrate. I.B.E.W. Sys. Council U-7 v. N.Y. State Elec. & Gas Corp., 180 F.3d 368, 370 (2d Cir. 1999) (per curiam). Whether a refusal is "clear and unequivocal" turns on the facts and circumstances of an individual case. Diamond "D" Constr. Corp. v. Int'l Union of Operating Eng'rs, Local Unions No. 17, 17A, 17B, 17C & 17R, 15 F. Supp. 2d 274, 289–90 (W.D.N.Y. 1990) (collecting cases). Because the statute of limitations is an affirmative defense, the party opposing arbitration has the burden of establishing, by prima facie proof, that the limitations period to compel arbitration expired. See Overall v. Estate of Klotz, 52 F.3d 398, 403 (2d Cir. 1995).

The Hospital argues that the limitations period should be measured either from April, 2010, when the 30 day window to submit a matter to arbitration closed, or September 2012, when it informed the Union that it was "not interested in pursuing this matter further" and informed the AAA that the matter had been withdrawn from arbitration and the file should "remain closed pending a final ruling by the Court." As the Hospital carries the burden of establishing that the Union's request was untimely, all reasonable inferences on this issue are drawn in the Union's favor.

In September, 2011, the Union informed the AAA that it had agreed with the Hospital on the selection of an arbitrator. Because this selection required the cooperation of both parties, it may be inferred that, at that time, the Hospital was actively involved in the arbitral process. Any action by the Hospital prior to the selection of an arbitrator could therefore not be a "clear and unequivocal" refusal to arbitrate. Similarly, the Hospital's subsequent request to

stay the proceedings pending a settlement and the difficulty scheduling an arbitration date may be viewed as ambiguous actions.

However, the Hospital's communication to the Union that it was "not interested in pursuing the matter further," coupled with its refusal to appoint a new arbitrator, shows a clear and unequivocal refusal to arbitrate.  In addition, its September 12, 2012, letter to the AAA requesting the case to remain closed pending a final adjudication by this Court is also a clear and unequivocal refusal to arbitrate.  See Schweizer Aircraft Corp. v. Local 1752, Int'l Union, United Auto., Aero. & Agric. Implement Workers of Am., 29 F.3d 83, 87 (2d Cir. 1994) (noting that a petition in state court to stay arbitration was an unequivocal refusal to arbitrate); Hotel Graystone Corp. v. N.Y. Hotel & Motel Trades Council, AFL-CIO, 902 F. Supp. 482 (S.D.N.Y. 1995) ("It was not until [plaintiff] filed a petition to stay arbitration in state court . . . that [plaintiff's] refusal to arbitrate became unequivocal and the six-month statute of limitations began to run.")

The Union argues that it believed arbitration was ongoing until August 5, 2013, when the Hospital informed the Court that there was no ongoing arbitration, despite the Hospital's earlier statements and actions.  Though the Union made representations to the Court until August, 2013, that arbitration was ongoing, the Union was on notice that the Hospital had no intention to arbitrate Yearwood's case from, at the latest, September, 10, 2012.  On that date, the Union told the AAA that the Hospital was "not interested in pursuing [the] matter further." In its August 5, 2013, communication to the Court, the Union indicated that this was the last action that it took in the matter.  Furthermore, the Union told Yearwood "many times" that the Hospital refused to arbitrate.  Thus, the Union was aware that the Hospital refused to participate in the selection of an arbitrator and the Hospital clearly and unequivocally communicated to the Union that it would not proceed with arbitration.

From September 10, 2012, when it was on notice, the Union had six months, until March 10, 2013, to compel the Hospital to arbitrate.  However, until its September 11, 2013, cross-claim, the Union took no action in support of arbitration.  Because the Union's motion and cross-claim to compel arbitration were filed more than six months after the expiration of the six-month statute of limitations, they are untimely.

II.  The Hospital's Motion for Summary Judgment Is Denied and Summary Judgment is Granted in Favor of Yearwood Against the Union.

Although Yearwood asserted separate counts against the Union and the Hospital under the NLRA and the LMRA respectively, these allegations together constitute a "hybrid" claim under section 301 of the LMRA, codified as 29 U.S.C. § 185, and the Union's duty of fair representation under the NLRA.  See DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 165 (1983).  While "[s]uch a suit, as a formal matter, comprises two causes of action, . . . the two claims are inextricably interdependent."  Id. at 164–65 (internal citations and quotation marks omitted).  In order to succeed on a hybrid section 301/duty of fair representation claim, a plaintiff "must not only show that [his] discharge was contrary to the contract but must also carry the burden of demonstrating a breach of duty by the Union."  Id. at 165 (internal citations and quotation marks omitted); see White v. White Rose Food, a Div. of DiGiorgio Corp., 237 F.3d 174, 178 (2d Cir. 2001) ("To establish a hybrid § 301/[duty of fair representation] claim, a plaintiff must prove both (1) that the employer breached a collective bargaining agreement and (2) that the union breached its duty of fair representation vis-a-vis the union members.").  "The employee may, if he chooses, sue one defendant and not the other; but the case he must prove is the same whether he sues one, the other, or both."  DelCostello, 462 U.S. at 165.

On the issue of whether the Union breached its duty of fair representation, the Court views the record in the light most favorable to the Hospital and the Union.  See Costello v.

City of Burlington, 632 F.3d 41, 45 (2d Cir. 2011).  On the issue of whether Yearwood was terminated for cause, the Court views the record in the light most favorable to Yearwood, as the non-movant.  Id.

<blockquote>a.   The Union Breached its Duty of Fair Representation.</blockquote>

As the exclusive bargaining representative for its members, a union has a statutory duty to fairly represent all of its members in its enforcement of a CBA.  Vaca v. Sipes, 386 U.S. 171, 177 (1967).  The duty of fair representation requires a union to "serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct."  Id.  A union breaches its duty of fair representation if it acts in a "discriminatory, dishonest, arbitrary, or perfunctory fashion." DelCostello, 462 U.S. at 164.  "[A]rbitrary conduct amounting to breach is not limited to intentional conduct by union officials but may include acts of omission which, while not calculated to harm union members, may be so egregious, so far short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary."  Nat'l Labor Relations Bd. v. Local 282, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., 740 F.2d 141, 147 (2d Cir. 1984) (internal quotation marks and citations omitted).

Under the Union's CBA with the Hospital, when a grievance is denied, the decision to arbitrate is within the discretion of the Union.  (See Minsky Aff. Ex. A, at 94.) "While 'a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion,' union members do not have an 'absolute right to have [their] grievances taken to arbitration.'"  Spellacy v. Airline Pilots Ass'n-Int'l, 156 F.3d 120, 128 (2d Cir. 1998) (quoting Vaca, 386 U.S. at 191).  However, once the Union decides to refer a meritorious claim to arbitration, it has an affirmative duty to fairly represent its members through the course of the

arbitration.  Samuels v. Air Trans. Local 504, 992 F.2d 12, 16–17 (2d Cir. 1993).  "[A] union

may breach its duty when it fails to process a meritorious grievance in a timely fashion with the

consequence that arbitration on the merits is precluded."  Young v. U.S. Postal Serv., 907 F.2d

305, 308 (2d Cir. 1990).

   As noted above, the first time the Union attempted to compel arbitration was on

September 11, 2013, one year after the Hospital requested that the AAA stay the matter.  During

that year, the Union removed Yearwood's case to this Court and filed a motion to dismiss, which

was fully briefed on December 19, 2012.  Between December 19 and March 10, 2013, when the

statute of limitations expired, the Union took no action on Yearwood's behalf.  There is no

indication that it requested further assistance from the AAA, nor is there any indication that it

attempted to convince the Hospital to proceed with arbitration.

   Viewing the facts in the light most favorable to the Union and the Hospital, it is

incontrovertible that the Union viewed Yearwood as having a meritorious grievance against the

Hospital.  (See Fletcher Aff. ¶ 10; Supp. Fletcher Aff. ¶ 6.)  It is also undisputed that the Hospital

unilaterally withdrew Yearwood's grievance from arbitration in September, 2012.  (Smith Aff.

Ex. C, at 1.)  The Court has also concluded that, as a matter of law, though the Union was on

notice of the Hospital's refusal to arbitrate as of September 10, 2012, it failed to timely move to

compel arbitration.  See Gerena v. Korb, 617 F.3d 197, 201 (2d Cir. 2010) (stating that a court's

application of a statute of limitations is a question of law).

   The consequence of the Union's inaction has been to forfeit the right to arbitrate

Yearwood's claim, which the Union viewed to have sufficient merit to cause it to commence an

arbitration.  "When a union ignores or perfunctorily presses a meritorious claim, it is held to have

acted arbitrarily."  Samuels, 992 F.2d at 16–17.  Thus, by failing to pursue Yearwood's claim for

more than one year, which denied Yearwood the opportunity to be heard before an impartial

arbitrator, the Union's actions were so egregious as to be arbitrary.  Consequently, the Court

concludes that, as a matter of law, the Union breached its duty of fair representation when it

failed to compel arbitration before March 10, 2013.

   The Hospital argues that it would be prejudiced by the Court's grant of summary

judgment against the Union in that it would not be able to argue that the Union had a reasonable

basis for its initial decision not to pursue Yearwood's grievance.  Arguments as to the Union's

actions before it initially brought the grievance to arbitration are immaterial to the determination

of whether the Union breached its duty of fair representation once it decided to pursue arbitration

on Yearwood's behalf.

   The conclusion that the Union breached its duty of fair representation permits

Yearwood's claim against the Hospital to be heard on the merits in this Court.  Young, 907 F.2d

at 307.  Consequently, by granting summary judgment against the Union, the Court addresses

only part of Yearwood's claim.  See id. at 309.  Further, the Union may not be held liable for

damages unless Yearwood prevails in his case against the Hospital as well.  See Vaca, 386 U.S.

at 197–98; Nat'l Labor Relations Bd. v. Local 485, Int'l Union of Elec., Radio & Mach.

Workers, AFL-CIO, 454 F.2d 17, 23 (2d Cir. 1972) ("Until some tribunal determines the validity

of the discharge, any assessment of back pay might well be regarded as speculative and

punitive.")

    b. There Are Material Issues of Fact as to whether the Hospital Breached
     the Collective Bargaining Agreement.

   Under the terms of the Hospital's CBA with the Union, with limited exceptions,

members employed by the Hospital may only be terminated "for cause."  (Minsky Aff. Ex. A, at

25, 88.)  Thus, a termination of an employee that was not for cause constitutes a breach of the

CBA and, consequently, a violation of the LMRA.  See Int'l Union, United Auto., Aero. &

Agric. Implement Workers of Am. (UAW), AFL-CIO v. Hoosier Cardinal Corp., 383 U.S. 696,

699 (1966).

   The Hospital argues that Yearwood was fired for cause because he violated

Hospital policy by accepting a package addressed to Rosen, a fictitious person, on behalf of

Cassells, a former employee.  According to the Hospital, this amounted to "gross misconduct."

In support of its characterization of Yearwood's activities, the Hospital asserts that Yearwood

was both aware of Hospital policy, and that he knew Rosen was not a Hospital employee.

   Yearwood disputes both of the Hospital's assertions and has stated that he was

unaware of Hospital policy, and he believed Rosen to be a Hospital employee.  (Stanberry

Affirm. Ex. A Ex. F, at 102–04, 110–11.)  Furthermore, Yearwood has come forward with

evidence that he was following internal mailroom procedures and that other employees received

a written reprimand for engaging in the same type of conduct for which he was terminated.  (Id.

at 113; Stanberry Affirm. Ex. A, at 158, 188–89.)

   Based on the record presented, and viewing the evidence in the light most

favorable to Yearwood, as the non-movant, the Court concludes that there are material facts in

dispute which would preclude summary judgment on the issue of whether Yearwood was

properly terminated for cause.

     c.   Yearwood's Claims Are Timely.

   The Hospital argues that Yearwood's hybrid § 301/LMRA claim is untimely.

Such a claim is governed by a six month statute of limitations.  DelCostello, 462 U.S. at 169.

The limitations period is measured from the time a union member knows, or reasonably should

have known, that a union breached its duty of fair representation.  Ramey v. Dist. 141, Int'l

Ass'n of Machinists & Aero. Workers, 378 F.3d 269, 278 (2d Cir. 2004).

As discussed above, the Union breached its duty of fair representation when it allowed the statute of limitations on its motion to compel arbitration to expire.  Before this time, the Union was able to pursue Yearwood's grievance through the arbitral process and, assuming it did so diligently, would have not breached its duty.  Thus, Yearwood's cause of action accrued on March 11, 2013, the day the Union could no longer proceed with arbitration.

Because Yearwood's cause of action accrued after the start of this action, and after he served the Union and the Hospital, his claims are necessarily timely.

III. <u>The Hospital's Motion to Strike Is Denied.</u>

The Hospital has moved to strike Fletcher's supplemental affidavit contained within the Union's reply because it introduces new facts and documents.  When new evidence is presented in a reply, a court may, in its discretion, address the new material.  <u>Bayway Refining Co. v. Oxygenated Mktg. & Trading A.G.</u>, 215 F.3d 219, 228 (2d Cir. 2000).

In addressing the instant motions, the Court has relied on one document submitted with Fletcher's supplemental affidavit, a fax from the Hospital to the Union granting an extension of time for the Union to refer Yearwood's case to arbitration.  (Supp. Fletcher Aff. Ex. B.)  The fax had previously been produced by the Union to the Hospital during discovery.  (<u>See id.</u>)  The Court has also relied on one representation contained within Fletcher's supplemental affidavit stating that the Union believed it could prevail in arbitration.  (Supp. Fletcher Aff. ¶ 6.)

Generally speaking, "reply papers may properly address new material issues raised in the opposition papers so as to avoid giving unfair advantage to the answering party."  <u>Bayway Refining Co.</u>, 215 F.3d at 226–27.  In its opposition to the Union's motion to compel arbitration, the Hospital asserted that the Union's initial request for arbitration was untimely under the terms of the CBA.  The issue of timeliness was raised for the first time by the Hospital.  Consequently, the Union was free to advance new evidence to rebut the Hospital's assertion.

- 21 -

Furthermore, the Hospital may not argue that the Union's submission was a surprise.  The fax in question had been sent by the Hospital and was also in the Hospital's possession at the close of discovery.  In addition, McCollister, representing the Hospital, previously testified under oath that the Union asked for, and received, an extension of time to request arbitration.  (Stanberry Aff. Ex. A Ex. F, at 91.)  The Hospital has also not raised concerns as to the authenticity of the document, nor has it requested leave to file a surreply in response to Fletcher's supplemental affidavit.

Therefore, the Court concludes it may appropriately rely upon the fax submitted with Fletcher's supplemental affidavit.  With respect to this document, the Hospital's motion to strike is denied.

The representation relied upon in Fletcher's supplemental affidavit, unlike the fax, is not a direct response to issues first raised by the Hospital and merely bolsters the Union's previous assertions.  Consequently, it was not properly before the Court.  Cf. Cifarelli v. Vill. of Babylon, 93 F.3d 47, 53 (2d Cir. 1996) (affirming a court's decision to rely on affidavits submitted with a reply when the opposing party was on notice of a potential defense).  However, the Court's Order of April 3, 2014, gave notice to the parties that it would consider additional materials that had been submitted to the Court.  (See Order 1, Docket # 80.)  Thus, the Hospital had an opportunity to respond to any additional representations the Union had made.  Consequently, it may not credibly argue surprise, or undue prejudice.[2]

---

[2] Even if the Court were to ignore the Union's representation that it believed Yearwood had a meritorious grievance, the record shows the Union treated Yearwood as having a meritorious grievance against the Hospital—it would not have referred Yearwood's matter to arbitration otherwise.  (See Fletcher Aff. ¶ 10; Stanberry Affirm. Ex. A Ex. F, at 18.)

Therefore, the Court concludes it may appropriately rely on the representation made in Fletcher's supplemental affidavit. With respect to this representation, the Hospital's motion to strike is denied.

Because the Court has not relied on any other document or representation in the supplemental affidavit, the Hospital's motion to strike the remainder is denied as moot.

## CONCLUSION

For the foregoing reasons, the Union's motion to compel arbitration (Docket # 44) is DENIED. The Hospital's motions for summary judgment and to strike the Union's reply (Docket # 57, 73) are DENIED. The Court sua sponte GRANTS summary judgment in favor of Yearwood against the Union, declaring that the Union breached its duty of fair representation. The Union's motion to amend the caption (Docket # 44) is GRANTED in accordance with footnote 1 on page 1 herein.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
April 22, 2014